CENTRAL COAL & COKE COMPANY v. PORTER.

Opinion delivered February 15, 1926.

1. NEGLIGENCE—ATTRACTIVE NUISANCE DOCTRINE.—Where an owner permits to remain unguarded on his premises anything which is attractive to children and from which injury may reasonably be anticipated, he will be liable if a child is injured thereby.

2. NEGLIGENCE—JURY QUESTIONS.—The questions whether defendant coal company maintained an attractive nuisance upon its premises, and whether the children were attracted to a place of danger thereby, *held* under the evidence to be for the jury.

3. MASTER AND SERVANT—EVIDENCE.—A finding that plaintiff's intestate was an employee of defendant company *held* sustained by the evidence.

4. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE.—Where human life is involved, an employee who is called upon to act quickly without time to consider results is not guilty of contributory negligence, unless his act is rash and reckless.

5. MASTER AND SERVANT—ASSUMED RISK.—An employee who, in order to save life, acted without recklessness in an extraordinary emergency caused by his employer's negligence, and was killed, will not be held to have assumed such risk, it not being one of the ordinary risks of his employment.

Appeal from Logan Circuit Court, Southern District; *James Cochran,* Judge; affirmed.

*John W. Goolsby,* for appellant.

*Evans & Evans,* for appellee.

HUMPHREYS, J. Appellee brought suit against appellant in his own right and as administrator for the estate of his minor son for damages in the sum of $3,000 on account of the death of his son caused through the alleged negligence of appellant in maintaining an attractive nuisance on its premises. Appellant denied the material allegations in the complaint, and interposed the further defenses of assumed risk and contributory negligence on the part of the deceased.

The cause was submitted to a jury upon the pleadings, the testimony adduced by each party, and the instructions of the court, which resulted in a verdict and judgment in favor of appellee for $3,000, from which is this appeal. The facts are practically undisputed, except

as to whether or not the deceased was in the employment of appellant at the time of his death. Appellant is the owner of a large number of coal mines, and owned and operated a large mine near Huntington in Sebastian County, known as mine No. 6. On account of the size of the mine and the accumulation of gas in the same, the State Mine Inspector required appellant to dig an air-shaft about one-half mile from the tipple, or main entrance, to secure proper ventilation and to provide an additional entrance and exit for the miners. The air-shaft or manshaft dug pursuant to the order was eight feet square and 180 feet deep. One-half of the space in the shaft was occupied by a stairway running from the top to the bottom of the shaft. This shaft was made safe for the miners to ascend and descend with slats and rails. The other part of the shaft was left open. A plank wall was built around the shaft with a roof over it. A floor was laid inside the wall over the mouth of the shaft, an opening being left for entry to the stairway. The wall had a door in it to accommodate the miners, which was constructed so that it would swing to or close when any one passed through it. To more actually visualize the situation, it may be said that the airshaft had a small house over it, which could be entered through a door that would shut of its own accord when one passed through it. The airshaft was located upon a large tract of land, either an 80 or 160-acre tract, which was used by appellant for a mule pasture. The tract of land had a good fence around it, with stiles and gates provided for the use of any one who desired to go through the pasture to the mine, the postoffice, or other places in the neighborhood. The shaft was near the center of this tract of land, and was dug in a pathway which had been made by persons passing through the tract. When the house was constructed over the shaft, the pathway was changed so as to run around it. The shaft house could not be seen by any one standing outside the fence inclosing the land on account of the underbrush and growing trees

upon it. Quite a lot of acreage near the shaft and small house was covered with a blackberry thicket. The people in that vicinity had picked blackberries upon the land for many years without objection or hindrance by appellant. On April 1, 1922, the mine was shut down on account of a strike, and was not operated for several months. During this period the door to the small house over the shaft was propped open and remained in that condition until after the death of appellee's son. While the mine was shut down, watchmen or caretakers were employed by the superintendent to look after it. They were stationed at the tipple, or main entrance of the mine. Appellee was employed as one of the watchmen or caretakers. These caretakers worked in shifts of eight hours each. Appellee testified that on several occasions he had to go away from home, and when it became necessary for him to do so he would leave his son in care of the mine as watchman or caretaker; that he went to Fort Smith on one occasion, and the superintendent made no objection when he told him he had left his son in his place. Testimony was also introduced by appellee showing that other watchmen or caretakers had done the same thing when it was necessary for them to be absent. On the 25th day of June, 1922, appellee had to go away, and he left his son, Roland Porter, in charge of said mine. Roland was in his eighteenth year, and competent to perform the duties of watchman. The superintendent came by and spent a part of the morning with him, and made no objection to his being there. Later in the day he departed, leaving the boy in charge. After the mine was shut down, the air intake was shut off by water; and poisonous gases of a deadly nature were formed, which found their way to the airshaft in the woodland about one-half mile from the tipple, or main entrance. On that day Yancy Roberts, a boy ten years of age, and a number of other children younger than he, were picking blackberries near the entrance of the shaft. They were attracted to the house over the shaft, and

Yancy entered the door in the wall and sat down upon the floor at the head of the stairway. In a few minutes he was overcome by the poisonous gases and fell down the stairway, lodging on one of the landings, where he subsequently died from the effects of the fumes. His screams attracted the attention of the other children, who attempted to rescue him, but were overcome and fell down the stairway into the shaft. After four children had fallen down the stairway a considerable distance, John Roberts and Bob Dunlap appeared upon the scene and attempted to rescue the children. Although strong and able-bodied, they were overcome with the gases also. Roland Porter received information that these people had fallen into the shaft, and hurried to their assistance. When he arrived, two of the children were hallowing, and one of the little girls was hanging over the stairway into the opening of the airshaft and was about to fall to the bottom thereof. Bob Dunlap was nearest the top, having descended two flights of steps. Roland immediately descended into the shaft and succeeded in pulling Bob Dunlap to the surface. After walking around for a while and freeing his lungs from the gas, he decided to go down and pull the little Robertson girl, whose body was hanging over the edge of the stairway, back toward the wall in order to prevent her from falling to the bottom of the airshaft. She was lying quite a distance down the stairway, but Roland concluded he could hold his breath long enough to perform this act. At the suggestion of a bystander he permitted those present to tie a rope around his waist to prevent him from falling over the stairway into the shaft in case he should be overcome by the gas. He reached the child and succeeded in removing her body back to the wall, but at that moment was overcome and could not return. He gave voice to conscious suffering by groaning before he died. Only one child who entered the shaft survived.

Appellee's case is bottomed on what is known in law as the turntable or attractive nuisance doctrine,

which has been succinctly stated in the following language: "Where an owner permits to remain unguarded on his premises anything dangerous which is attractive to children and from which injury may reasonably be anticipated, he will be liable if a child is injured thereby." *Brinkley Car Company* v. *Cooper*, 60 Ark. 545; *Nashville Lumber Co.* v. *Busbee*, 100 Ark. 76. Under our decisions and the cases cited in support of them, this humane doctrine is applicable alike to children, whether trespassing or invited upon the lands of another. In the case of *United Zinc & Chemical Company* v. *Britt*, 258 U. S. 268, the court applied the rule in such manner as to withdraw its protection from children who were not attracted upon the land of another by the nuisance itself. Appellant herein relied upon the Britt case, directing its testimony and formulating its requested instructions upon the theory that it was exempt from liability unless the children were attracted upon the premises and to the place of danger as well by the house over the airshaft. Even under the rule announced in the Britt case, which it is unnecessary for us to approve or disapprove in determining the issue now before us, appellant has failed to bring itself within its protection, for the undisputed testimony in the instant case reveals that the children were not trespassers upon the premises when attracted to the place of danger by the little house over the airshaft. They were licensees. For many years the people in that vicinity, including men, women, and children, were allowed without objection or hindrance to go up on the premises for the purpose of picking blackberries. It was estimated that the blackberry thicket upon the place near the little house over the shaft covered about twenty acres. In addition to this, stiles and gates were built in the outside fence for the convenience of any one desiring to enter or pass through the premises, and the little house over the airshaft was built in a pathway made by the people who frequented said premises. The situation was just as if the children had been enticed

upon the premises from the outside by the house, since they were allowed to enter the premises, where they would likely be attracted to the place of danger by the house.   The questions of whether appellant maintained an attractive nuisance upon its premises and whether the children were attracted to the place of danger thereby, were submitted to the jury under correct instructions, and there is substantial evidence in the record tending to support the finding of the jury that the house was sufficiently attractive to entice the children to the place of danger and to suggest to appellant the probability of accident, and that it did so, resulting in the tragedy.   The very shaft in question was constructed to permit circulation and purify the air in the mine so that the lives of miners might not be endangered on account of the formation of dangerous gases in the mine.   The superintendent knew that the air intake had been closed by the accumulation of water in the mine, that the fans had been closed down, and that poisonous gases would be formed in the mine, which would necessarily find an outlet through this opening in the earth.   The testimony also reveals that the door of the house over the airshaft was left open and even propped open during the time the mine was shut down.   The house with the open door offered no protection to children allowed upon the premises against this inviting and deadly danger.

Appellants contend however that, even if negligent in maintaining an attractive nuisance, this did not justify Roland Porter in going to the rescue of the children who were screaming, groaning, and dying in the airshaft. Having entrapped these children through negligence, the duty rested upon appellant to resort to extraordinary means, if necessary, to save their lives.   No less duty rested upon its employees.   Appellant seeks to escape liability and obtain a reversal of the judgment upon the grounds: First, that Roland Porter was not its employee; and second, that he was guilty of contributory negligence and assumed the risk in attempting the rescue.

(1). We cannot agree with appellant's interpretation of the evidence to the effect that it indisputably shows that Roland Porter was not its employee. While not a regularly employed watchman, the testimony tends to show that his services as a substitute watchman were accepted by the superintendent of the mine during his father's absence. It was shown that another watchman had substituted his son for a considerable length of time, and that appellee had done so on a former occasion with the knowledge of the superintendent. The superintendent was frequently at the mine while it was shut down, and on the morning of the tragedy had visited the mine and knew that Roland was in charge thereof. He went away without making any objection to him acting as a substitute watchman for his father. The issue of whether or not Roland Porter was an employee of appellant was submitted to the jury under a proper instruction, and appellant is bound by the finding of the jury to the effect that he was.

(2). Under the rescue doctrine, human life being involved, a liberal rule prevails with relation to contributory negligence. In such cases one is called upon to act quickly without much time to consider results, and is not held by the law to as strict account as when performing ordinary acts in doing his work. The law excuses him when engaged in extraordinary duties or emergencies to save the life of human beings, unless his act is rash and reckless. The rescue doctrine is well stated in syllabus No. 1 in the case of *Corbin* v. *Philadelphia,* 195 Pa. 461, 78 A. S. R. 825, which is as follows: "A rescuer who, from the most unselfish motives, prompted by the noblest impulses that can impel man to deeds of heroism, faces deadly peril, ought not to hear from the law words of condemnation of his bravery, because he rushes into danger to snatch from it the life of a fellow creature, imperiled by the negligence of another, but he should rather listen to words of approval unless regretfully withheld on account of the unmistakable evidence of his rashness and imprudence." Appellant asked for

no instruction submitting the issue of contributory negligence to the jury, but did ask one submitting the issue of assumed risk, which was refused by the court over its objection and exception. This instruction, however, did not embody the idea that a rescuer does not assume extraordinary risks when performing emergency acts to save life unless they are rash and reckless acts on his part. Under his employment a laborer assumes only ordinary risks incident to the work in which he is engaged. We see no reason why the rescue doctrine should not be applied to the assumption of risks in the same manner that it is applied in cases of alleged contributory negligence. It cannot be said that the undisputed testimony in this case shows that the acts of Roland Porter were rash and reckless. He had succeeded in rescuing one and might well have concluded that he could prevent the little Robertson girl from falling to the bottom of the opening without encountering certain death on his part. The instruction requested by appellant did not correctly state the law applicable to the facts in the case, so the trial court did not err in refusing to give it.

. Appellant also contends for a reversal of the judgment herein because the court allowed the deposition of Minnie Robertson to be read in evidence. The objection made to the introduction of the deposition was that the officer before whom it was taken transmitted it to the attorney for appellee, instead of to the clerk of the court. The deposition was taken under an agreement which provides: ''We waive all formalities as to the manner of taking, transcribing, and transmitting of said depositions.'' The deposition was properly admitted under the agreement.

Appellant also contends for a reversal of the judgment because the trial court allowed appellee to introduce certain pieces of evidence, which we have carefully read. We think each piece of evidence objected to was responsive to the issue joined, and therefore admissible.

No errors appearing in the record, the judgment is affirmed.